SALTER, J.
(dissenting).
I respectfully dissent based on the unique facts elicited by Ms. Gutierrez during jurisdictional discovery. In this case, unlike the reported opinions relied upon by my colleagues and Dr. Taylor, a non-Florida resident, the cruise ship doctor systematically and continuously staffed an onboard medical clinic and treated passengers and crew while Royal Caribbean Cruise Line (RCCL) vessels were in Florida territorial waters. In my view, these activities were sufficient to establish jurisdiction over Dr. Taylor under section 48.193(2), Florida Statutes (2011), and to *424 satisfy the “minimum contacts” requirements.
I. The Jurisdictional Allegations and Course of Discovery
Ms. Gutierrez alleged in her amended complaint against RCCL and Dr. Taylor that she and her husband boarded an RCCL vessel in May 2010 at Port Everglades, Florida, for a seven-night cruise in the western Caribbean. On the second night of the cruise, Ms. Gutierrez experienced intense abdominal pain and was taken by wheelchair to the medical facility aboard the vessel. She alleged that Dr. Taylor diagnosed and treated her for gastritis, when in fact she was suffering from a much more serious and dangerous abdominal infection. She alleges that she and her husband were told she could not be evacuated from the vessel and taken to an on-shore hospital, when in fact air ambulance service could have been arranged. Ms. Gutierrez sought medical assistance at the ship’s next port. Ultimately, she claims, she suffered abdominal sepsis, multiple organ failures, and a cerebral hemorrhage as a result of the negligence and misinformation on the part of RCCL and Dr. Taylor.
The pertinent jurisdictional allegations within the amended complaint included allegations that Dr. Taylor engaged in business subjecting him to Florida jurisdiction under section 48.193(2) by, among other things:
[25. a. (1) ] Providing shipboard medical care to passengers and/or crew members, to include passengers and/or crew members aboard the [RCCL vessel] and other cruise ships for voyages to include the voyage at issue while in the territorial waters of the State of Florida;
[25. a. (2) ] Operating, conducting, engaging in, or carrying on a business or business venture in the State of Florida by fact of operating shipboard Medical Facilities, to include the one onboard the [RCCL vessel] and other cruise ships for voyages to include the voyage at issue while in the territorial waters of the State of Florida ....
(Emphasis supplied).
Dr. Taylor filed, among other motions, a motion to dismiss the amended complaint for lack of personal jurisdiction and a three-page sworn declaration disclaiming, in essence, citizenship, residency, property ownership, operation of a business, licen-sure as a physician, having an office or agency, or engaging in substantial business, in the State of Florida. During jurisdictional discovery, counsel for Ms. Gutierrez established an array of contacts with and in Florida, including the ownership of bank accounts in Miami, attendance and instruction at cruise ship medical courses in South Florida, the solicitation and execution of his contracts in Miami with cruise lines including RCCL, and occasional shore side visits to see friends. I agree with my colleagues that many of these contacts (such as attendance and instruction at medical courses in Florida) have been ruled in prior cases to be “incidental” to a cruise ship physician’s medical duties and thus insufficient to support personal jurisdiction under section 48.193(2). See, e.g., Farrell v. Royal Caribbean Cruises, Ltd., 2013 WL 178367 (S.D.Fla. Jan. 4, 2013).
Dr. Taylor’s deposition testimony, however, included confirmation that his medical duties included treatment of crew members and passengers while a vessel was in Florida ports and coastal waters:
Q. It’s my understanding that during the time that you worked for Royal Caribbean, you worked on some vessels that had the home port in the State of Florida, correct?
*425 A. Yes.
Q. And when working on those ships with the home port in Florida, you provided medical care to patients onboard the ship in the State of Florida, correct?
[Counsel for Dr. Taylor]: Objection to form.
A. [Dr. Taylor]: Generally speaking, the ship’s medical center is closed when the ship is in embarkation day, which would be the home port day. That’s for reasons that we have to take care of supplies.
The medical center is usually open just for one hour in the evenings, which 99 percent of the time is simply for crew members because most of the guests have only been onboard by that time a couple of hours, which is generally not enough time to become significantly ill.
There will be occasions when emergencies happen, both on the day of departure and on the last few hours of the cruise on the — prior to arrival, where emergency care has to be rendered.
Q. So you have provided medical care in the State of Florida onboard the Royal Caribbean ships, correct?
[Counsel for Dr. Taylor]: Objection to form.
A. [Dr. Taylor]: There will have been occasions, I’m sure.
Q. So you’re not denying that you provided medical care to patients in the State of Florida, correct?
A. On an emergency basis, that is correct.
Q. What about the crew members, didn’t you see crew members while in the State of Florida on a nonemergency basis, that were sick or had an injury or for whatever reason need to see a doctor?
A. The ship’s medical.center was generally open one hour on embarkation day, which I’m no expert on the nautical miles, but that was probably within Florida territorial waters.
Q. So for that one hour, you would treat patients while the ship was likely in Florida territory waters, correct?
A. That could be the case, yes.
Q. Was that ever not the case?
.[Counsel for Dr. Taylor]: Objection to form.
A. Yes, very much so, because when there’s more than one doctor on the ship, not every doctor is working the clinic. So if it’s a two-doctor ship, you may only work that clinic every other week.
Q. Okay.
A. And then, of course, it’s dependent on whether people come in.
Q. So, if you’re on a ship that was in a Florida port on a weekly basis, then likely you would see patients on a weekly basis within the State of Florida, if you’re on duty that particular day?
[Counsel for Dr. Taylor]: Objection to form.
A: Yes, if I was on duty.[7]
[[Image here]]
Q. Sir, with respect to your treatment of patients in the State of Florida, do you have copies of medical records or other records which would indicate patients that you treated in the State of Florida?
A. No, I don’t.
(Footnote added).
Additional evidence established that Dr. Taylor had been in port on duty aboard RCCL vessels 32 days in 2010 during em- *426 barkment and disembarkment visits to Florida ports, and additional days over the several years Dr. Taylor served ■ RCCL and another cruise line based in Florida.
Following jurisdictional discovery, the trial court heard the motion to dismiss for lack of jurisdiction and denied it in a detailed order, determining that specific personal jurisdiction under section 48.193(1) had not been acquired over Dr. Taylor, and that general personal jurisdiction had been acquired under section 48.193(2). This appeal followed.
II. Analysis
It is undisputed that Ms. Gutierrez’s illness and treatment occurred outside the territorial waters of Florida, and thus the trial court’s rejection of specific personal jurisdiction under section 48.193(1) is correct. With regard to section 48.193(2), we apply two tests under the oft-cited case of Venetian Salami Co. v. Parthenais, 554 So.2d 499 (Fla.1989), strictly construing the long-arm statute in favor of the nonresident defendant. Ferguson v. Estate of Campana, 47 So.3d 838 (Fla. 3d DCA 2010).
A. “Substantial and Not Isolated Activity in Florida”
The first test is whether Dr. Taylor engaged in “substantial and not isolated activity within this state” over the course of his six years with another cruise line and three years with RCCL. My colleagues are correct that a number of our opinions establish that personal vacations in Florida between cruises, visits to be interviewed by cruise lines, the execution of agreements in Florida, and similar “incidental” or “almost personal” contacts[8] fall short of the “continuous and systematic business contacts” with Florida required to establish general personal jurisdiction under 48.193(2). See E & H Cruises, Ltd. v. Baker, 88 So.3d 291 (Fla. 3d DCA 2012).
But those state and federal cases before this one, it appears, have not involved a cruise line physician whose duties and actual activities over a course of years (and for out-and-back cruises from Florida ports) included the treatment of crew members and passengers while a vessel is in Florida territorial waters and while it is docked in a Florida port. In Rinker v. Carnival Corp., 2011 WL 3163473 (S.D.Fla. July 26, 2011), a citizen of, and nurse registered in, Australia worked aboard a Florida-based cruise line’s vessels, often departing from and returning to Florida ports. The court concluded that her contacts with Florida fell short of the continuous and systematic contacts necessary to establish general jurisdiction, finding specifically that, although she had been aboard a ship that docked in Florida 16 times, “the evidence shows that [the nurse] never provided any medical care while aboard a ship that was docked in Florida.” Id. at *4.
Similarly, in Farrell, an RCCL nurse was a citizen and resident of South Africa. She was aboard RCCL cruise ships when they docked in Florida 159 times. The court concluded that medical training in Miami, the appointment of RCCL as her agent under a contract, and management by RCCL’s shore side medical department in her administration of onboard treatment (in international waters), were not sufficient to establish general jurisdiction, noting again specifically that “[n]o evidence has been produced, however, establishing that [the nurse] was on duty and/or treated any passengers while the ships were docked in Florida” and “there is no evidence that [the nurse] treated any patients *427 while docked in Florida ports.” Farrell at *3.
And again, in the case cited as “particularly persuasive” by my colleagues, Hesterly v. Royal Caribbean Cruises, Ltd., 2008 WL 516495 (S.D.Fla.2008), the cruise ship physician defendants’ affidavits stated that they “never treated any patients while the vessel was within the State of Florida,” and the plaintiff provided no deposition testimony to contradict the affidavits.[9] Id. at *8. In contrast, in the case at hand Dr. Taylor testified that it was a regular part of his assignment as a paid physician to be on duty, and when necessary to . treat patients, while the vessel was in Florida waters and returning to Miami, docked in Miami, and leaving Miami, weekly, over a course of nine years.
This is not a distinction without a difference, as any Florida-based ship’s captain with a casino aboard might explain — the unregulated gambling prohibited by Florida law doesn’t begin until the ship is in international waters.[10] Providing medical treatment in Florida ports and territorial waters for compensation, over a course of years, and from week to week, is not “incidental, almost entirely personal” activity. And included within that scope of work is the duty of being available, as part of Dr. Taylor’s duties, to treat crew members and patients during those times the vessel was in a Florida port or territorial waters. As one of RCCL’s attorneys explained to the trial judge in a hearing explaining why RCCL should not have to produce daily patient logs (redacted to eliminate names or other private information about individual patients) for the days the ship was in port or in Florida waters:
.. .if it’s their position that, you know, whether he was practicing medicine in Florida territorial waters is what’s relevant, then arguably all they need to know is the number of times he was on a ship and that ship was in a port of Florida or in Florida waters. It doesn’t matter whether [Dr. Taylor] saw four people or zero people. You know, he’s practicing medicine regardless of whether or not he’s treating someone. Just like if I’m in my office and I don’t have a client, that doesn’t mean I’m not practicing law. So there’s no reason for them to have, you know, X number of patients.
I agree with that candid assessment, and I question whether RCCL should be able to feature on-line marketing videos regarding its onboard medical services (as jurisdictional discovery established in this case) — apparently available while the ship is in Florida and Florida waters — while Dr. Taylor disclaims Florida jurisdiction over him.
B. “Minimum Contacts” and Constitutional Due Process
The second of the two Venetian Salami tests — “minimum contacts” with Florida for federal and state constitutional purposes — is also satisfied. In assessing a defendant’s contacts, “ ‘the facts ■ of each case must always be weighed in determining whether personal jurisdiction would comport with fair play and substantial justice,’ and ‘any talismanic jurisdictional for- *428 muías’ are expressly rejected.” [11] In the present case, the exercise of personal jurisdiction over Dr. Taylor can hardly be labelled unfair or unjust. His regular personal presence in Florida, and his professional duties and treatment performed in Florida ports and waters, constituted a purposeful avaihnent of the privilege of performing medical services in Florida,[12] such that he could “reasonably anticipate being haled into court” in Florida. WorldWide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
My colleagues’ reliance on Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), warrants further analysis. In that case, four United States citizens perished in a helicopter crash in Peru. The decedents were employed by a Peruvian venture with an office in Texas. The helicopter was owned by Helicópteros, a Colombian company. An executive of Heli-cópteros had flown to Houston to discuss the Peruvian project, but Helicópteros had never conducted its business (flying helicopters for oil and construction companies in South America) anywhere in Texas. Id. at 411, 104 S.Ct. 1868. The families of the decedents initiated wrongful death actions in Texas against a group of defendants that included Helicópteros, and the question was whether general jurisdiction over Helicópteros had been established.
The Supreme Court of the United States reversed the decision of the Supreme Court of Texas (which had upheld general jurisdiction in that state), holding that “the one trip to Houston by [Helieopteros’s] chief executive officer for the purpose of negotiating the transportation-services contract with [the Peruvian venture] cannot be described or regarded as a contact of a ‘continuous and systematic’ nature.” Id. at 416, 104 S.Ct. 1868. The Court also rejected the plaintiffs’ arguments that the acceptance by Helicópteros of payment checks drawn on a Houston bank, and visits to Texas by Helicópteros personnel for purchases and training, were a sufficient basis for general jurisdiction. Id. at 417, 104 S.Ct. 1868.
Simply stated, Helicópteros never offered to provide, and never provided, any helicopter flights in Texas. Such flights were the business of Helicópteros, and that business was conducted in Colombia and elsewhere in South America. In the case at hand, Dr. Taylor’s business is as a doctor. His willingness and ability to deliver such services to passengers in Florida ports and territorial waters was established. Dr. Taylor’s availability, and those services, were continuous and systematic by virtue of the weekly schedules of RCCL and its ships over a course of years. Those facts made it foreseeable that Dr. Taylor would be haled into court in Florida.

Conclusion

Dr. Taylor could easily be considered a doctor without a country,[13] residing aboard *429 ship and in international waters rather than a specific home or country. But this case, unlike prior state and federal precedent on the point, features competent, substantial evidence that the physician’s paid duties and patient treatment (frequent, recurring, and continuing over a course of years) included medical duties and services while in Florida ports and territorial waters. Accordingly, I would affirm the trial court’s order denying Dr. Taylor’s motion to dismiss the amended complaint for lack of personal jurisdiction.
I disagree with the majority’s view that the trial court relaxed the requirements of “well-established case law in order to redress what it clearly deemed a nefarious scheme by Dr. Taylor to avoid being sued not only in a Florida court but in any court....” (Emphasis in the original). This is apparently the first case in which a non-resident shipboard physician has conceded under oath that his medical duties included availability and services rendered to patients in Florida ports and territorial waters, on an almost weekly basis over a course of years.
For these reasons, I would affirm, and I respectfully dissent from my colleagues’ opinion.

. Despite these admissions, Dr. Taylor’s initial brief claims, incorrectly, that “Dr. Taylor did not provide any medical treatment in Florida or its territorial waters.”

. Elmlund v. Mottershead, 750 So.2d 736, 737 (Fla. 3d DCA 2000).

. In Hesterly, the plaintiff did not take the depositions of the defendant doctors. In their interrogatory answers, "Both doctors answered that they never treated any patients while the vessel was docked in Florida or while the vessel was within the territorial waters of the State of Florida.” Id. at *1 n. 1.

. Spectrum Gaming Gip., Gambling Impact Study: Part I, Section A 30 (Commissioned by Fla. Leg.)(July 1, 2013), available at http:// www.leg.state.fl.us/GamingStudy/docs/FL_ Gambling_Impact_Study_PartlA.pdf (last visited October 18, 2013).

. Mark A. Sessums and Brian M. Monk, A Wrinkle in Time: Personal Jurisdiction's Evolution — Pleading, Proving and Defending Personal Jurisdiction Issues, 87 Fla. Bar. J. 16, 19 (Nov. 2013) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 485-86, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

. Edward Everett Hale imagined "The Man Without a Country, ” an American who renounced his citizenship and thereafter moved only from ship to ship, in a short story published in The Atlantic magazine in December 1863.